[No. 31489-4-II. Division Two. September 13, 2005.]

WILLIAM R. PITTS, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

---

*Thomas C. Fox*, for appellant.

*Robert M. McKenna, Attorney General*, and *William B. Work, Assistant*, for respondent.

¶1 ARMSTRONG, J. — William Pitts appeals an administrative ruling that he is not eligible for services from the Division of Developmental Disabilities because he is not "substantially handicapped." We affirm, holding that the administrative law judge did not err in interpreting the rules and that sufficient evidence demonstrates that Pitts is not "substantially handicapped" according to the administrative rules defining covered developmental disabilities.

## FACTS

¶2 William R. Pitts, who was born on December 4, 1963, began having convulsive seizures at 11 months of age. In 1971, he was tested for intelligence and found to be functioning in the "normal to above average 'bright' range."

Administrative Record (AR) at 71. Then in 1975, he suffered a grand mal seizure, was in a coma for three days, and lost the ability to dress and care for himself. He also had difficulty communicating and could give only one-word responses. He exhibited psychotic behavior, aggression, and poor impulse control. His most recent full scale intelligence quotient was 71.

¶3 As a child, Pitts enrolled in special education in Wenatchee, Washington, and then at the Brown School in Austin, Texas.[1] At age 18, he left the Brown School and returned to live with his mother. During his stay with her, he had at least three admissions to Eastern State Hospital, in addition to psychiatric hospitalizations in Bellingham and Western Washington State Hospital (WSH).

¶4 In 1994, Pitts applied to the Division of Developmental Disabilities (DDD) for employment and residential services. DDD is a division of the Department of Social and Health Services (Department). To determine whether his epilepsy constituted a "substantial handicap" sufficient to qualify for services, DDD solicited information about Pitts from Richard M. Lynn, M.D. AR at 57-58. Lynn wrote that Pitts "is notoriously unreliable about taking his medicines and supervision for that purpose would be a safety measure." AR at 57. DDD found that he met the "epilepsy requirements for DDD eligibility." AR at 58. At the time, Pitts was living in the community, either with his mother or in his own apartment.

¶5 Then in 1995, DDD began to question his eligibility, noting that he prepared most of his own meals, cleaned his own living area, and did not require any reminders or assistance with self-care tasks. But in 1997, he was admitted to WSH after a series of incidents involving unlawful behavior. These included an assault on his mother, exposing himself to children, and stalking women and touching them in a sexual manner.

---

[1] He also attended Child Study and Treatment Center in Tacoma, Washington.

¶6 WSH staff members observed Pitts suffer up to five seizures since his admission in 1997, including two incidents in 2000 and three incidents in 2001. While he lost consciousness on at least two of these occasions, he did not fall but, instead, "went slowly on the ground" and was not physically injured. AR at 39. WSH staff supervises Pitts to ensure that he is taking his prescribed antiseizure medications as well as his antipsychotic medications. WSH has never reported that Pitts has overdosed or suffered from medication toxicity or life threatening side effects of his medications.

¶7 William Comte, M.S.W., AC-SW, reported that when Pitts resided with his mother or on his own, he would stop taking his medications and attending his appointments with his mental health counselor, and he would "predictably decompensate and engage in law breaking behavior, often of a sexual nature." AR at 93. Yet Pitts has never exhibited assaultive behavior at WSH. And Pitts "fantasizes living independent of structure and limitations, but when given the opportunity, he quickly sabotages himself, stops adhering to medical directives and decompensates." AR at 96.

¶8 In 2001, Greg Killingsworth of DDD reviewed Pitts's file and concluded that Pitts no longer met the eligibility requirements for DDD services under the "epilepsy" category. Killingsworth emphasized that Pitts had no "risk of medication toxicity or serious dosage side effects threatening [his] life." AR at 61-62. Consequently, he determined that Pitts did not suffer from a "substantial handicap" in connection with his epilepsy. AR at 38. In addition, he found that Pitts failed to qualify for services under other categories such as: (1) Mental Retardation, former WAC 388-825-030(2)(b) (2001); (2) Another Neurological Condition, former WAC 388-825-030(6)(a)(ii) (2001); or (3) Other Condition, former WAC 388-825-030(6)(b)(v) (2001).[2]

---

[2] WAC 388-825-030 was amended effective July 2, 2005. WASH. ST. REG. 05-12-130 (June 1, 2005).

¶9  Pitts appealed Killingsworth's decision to the Office of Administrative Hearings. At the hearing, the parties agreed that Pitts had chronic epilepsy with partially controlled seizures. They also agreed that Pitts's epilepsy originated before he reached 18 years of age and is expected to continue indefinitely.

¶10  Dr. Winston Yao, M.D., board certified neurologist at WSH, testified that without a supervised, structured environment, Pitts would likely not take his medications and that without them he would be at an increased risk for seizures and injury. He also said that Pitts "doesn't need physical assistance . . . to take [his medicine], but he needs [someone] to tell him the time to take it." Audio Transcription (AT) (July 15, 2002) at 31.

¶11  Dr. Paul Hageman, attending psychiatrist at WSH, testified that although Pitts willingly takes his medications now, he has resisted taking them in the past. Pitts needs only an occasional reminder to take his medications, but he still requires "assistance of some kind" with his medications. AT (July 15, 2002) at 48. In general, he cooperates and takes his pills without physical assistance, and he is working toward "self medication," a program "where a person identifies which medicines [they're] taking and they know it by color and size." AT (July 15, 2002) at 40-41. Dr. Hageman explained that Pitts has the cognitive ability to self-medicate, but "he's not quite there." AT (July 15, 2002) at 41-42. Pitts can open a bottle, differentiate between different pills, and take his medicine independently. He opined that "Pitts is able to . . . [i]dentify medication, seek assistance in understanding medication issues, identify the possible side effects, [and] seek assistance with side effects." AT (July 15, 2002) at 40.

¶12  Dr. Hageman also speculated that if there were no directives, and Pitts were relying on himself in the community, he would probably take no medication after a while. While Pitts understands he has to take his seizure medication, he does not appreciate the need for his psychiatric medication. And if Pitts stopped taking his psychiatric

medication, he would quickly lose the ability to understand the need to take his seizure medication. Dr. Hageman testified that if Pitts is not taking his seizure medication, his seizures can be dangerous, "[h]e could fall, hurt himself . . . [or] he could even die" from choking or suffocating. AT (July 15, 2002) 38, 46.

¶13 Mary Larson, resource management supervisor at DDD, testified that "the issue with Mr. Pitts is not that he would take too many medications, it's, always his refusal to take medication." AT (July 15, 2002) at 75. She clarified, "I don't think there was ever a concern that he would overdose on medications." AT (July 15, 2002) at 75.

¶14 Susan Poltl, program manager at DDD,[3] testified that she was involved in developing the former Washington Administrative Code (WAC) 388-825-030. She explained that the WACs do not try to define all of the people within an eligibility parameter, "but to get to the most disabled population." AT (July 15, 2002) at 108. For epileptics, the WACs target persons who would be at risk of brain damage or trauma without assistance and monitoring of their medications—as opposed to persons who have "partially controlled . . . seizures." AT (July 15, 2002) at 108. She explained that persons who experience brain damage or trauma have more than just grand mal seizures.

¶15 Poltl explained that direct physical assistance means "you actually have to measure it out and figure out what they're supposed to take and hand it to them . . . people who need the hands on assistance." AT (July 15, 2002) at 109. Such people need more than reminders or oversight. "[D]irect physical assistance means someone actually has to do [the] task for the person and . . . get all of that ready for them, they can't just verbally remind them or cue them." AT (July 15, 2002) at 110. She also believes a person's need for psychiatric support does not make him eligible for DDD services.

---

[3] Poltl began employment there in 1980.

¶16 In addition, Poltl asserted that Pitts's "issue is that he doesn't want to take his medication." AT (July 15, 2002) at 112. She maintained that he understands what he is supposed to do and when, emphasizing:

[W]e've seen him at various times and the history we have, is that he went for many, for long periods of time with no monitoring and would have an occasional seizure, but didn't have any evidence of brain damage or trauma risk . . . [n]or did he exhibit any cognitive issues or physical impairment issues that would interfere with his understanding [of] what he was supposed to do and when he was supposed to do it.

AT (July 15, 2002) at 113.

¶17 Poltl also opined that having seizures from failing to take medication is not a "serious dosage side effect." AT (July 15, 2002) at 117-18.

¶18 The parties agreed to continue the hearing to allow DDD to administer the Inventory for Client and Agency Planning (ICAP) test to Pitts. Pitts's scores fell well below the range of nonhandicapped individuals, more closely resembling those who are mildly mentally retarded or mentally ill. DDD and Pitts stipulated that each of his scores is more than two standard deviations below the mean for their respective domains of behavior.

¶19 The Department interpreted the ICAP test results and informed Pitts that he was still ineligible for DDD services. Killingsworth explained:

While DDD recognizes that you may have a partially controlled seizure disorder, we believe the epilepsy is not the cause of your functional disability. In our opinion it is your chronic history of personality and behavior disorders that has resulted in your disabled functioning. This opinion is supported by your previous independence in community living and your ability to do many things successfully. We believe that your motivation to do them, or your "ability" to do them, is affected by psychiatric issues, not your epilepsy. . . . In your case there is no clear connection between your scores on the ICAP and your condition of epilepsy.

AR at 170.

¶20 When the hearing reconvened, Poltl testified that the ICAP gives only a functioning level, but it does not differentiate between chronic mental illness and mental retardation.

¶21 The administrative law judge (ALJ) affirmed the Department's decision, concluding that Pitts's epilepsy did not constitute a substantial handicap under former WAC 388-825-030. He reasoned that while it is undisputed that Pitts suffers from an epileptic condition that originated before his 18 birthday and is expected to continue indefinitely, he does not require an individual to monitor or directly assist him with his medication to avoid toxicity or serious dosage side effects. And while Pitts's ICAP scores are at least two standard deviations below the mean, it is impossible to determine whether they are attributable to his mental illness or psychiatric condition.

¶22 Pitts appealed to the Department's Board of Appeals, which affirmed the ALJ's decision. The Thurston County Superior Court also affirmed the ALJ's decision.

## ANALYSIS

¶23 Pitts argues that despite his mental illness, he is qualified for services from DDD as a person with "epilepsy" (former WAC 388-825-030(4)) or "other condition" (former WAC 388-825-030(6)(b)), which originated before he was 18 years old, is expected to continue indefinitely, and results in a substantial handicap. The Department contends that while he meets some of the criteria for these conditions, he does not meet all components of eligibility for either one.

### I. Standard of Review

¶24 On review of an agency decision, we sit in the same position as the superior court and apply the standards of the Administrative Procedure Act (APA), chapter 34.05 RCW, to the agency record. *Hertzke v. Dep't of Ret. Sys.*, 104 Wn. App. 920, 926, 18 P.3d 588 (2001) (citing *Tapper v.*

*Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993)). The APA lists nine grounds for reversal of an agency action. Pitts bases his appeal on three:

> (d) The agency has erroneously interpreted or applied the law;
>
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
>
> . . . .
>
> (h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency.

RCW 34.05.570(3). Pitts has the burden of demonstrating the invalidity of the Department's decision. RCW 34-.05.570(1)(a). Moreover, he must show that the Department's action prejudiced him. RCW 34.05.570(1)(d).

¶25 Although we review issues of law de novo, we give substantial weight and deference to an agency's interpretation of the statutes and regulations it administers. *St. Francis Extended Health Care v. Dep't of Soc. & Health Servs.*, 115 Wn.2d 690, 706-07, 801 P.2d 212 (1990). We will uphold an agency's interpretation if it is plausible and not contrary to legislative intent. *Seatoma Convalescent Ctr. v. Dep't of Soc. & Health Servs.*, 82 Wn. App. 495, 518, 919 P.2d 602 (1996).

¶26 When we review for substantial evidence, we determine "whether the record contains 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000)). We overturn an agency's findings of fact only when they are "clearly erroneous" and we are "'definitely and firmly convinced that a mistake has been made.'" *Pollution*

*Control*, 151 Wn.2d at 588 (quoting *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994)). We do not weigh the credibility of witnesses. *Pollution Control*, 151 Wn.2d at 588 (citing *Bowers v. Pollution Control Hearings Bd.*, 103 Wn. App. 587, 596, 13 P.3d 1076 (2000)).

## II. DEVELOPMENTAL DISABILITIES UNDER CHAPTER 71A RCW AND WAC 388-825-030

¶27 Under RCW 71A.10.015, "the legislature's manifest policy is to assist those with developmental disabilities to have the same full and productive lives as others." *Campbell v. Dep't of Soc. & Health Servs.*, 150 Wn.2d 881, 895, 83 P.3d 999 (2004). This goal is "necessarily dependent on the individual having a developmental disability in the first place." *Campbell*, 150 Wn.2d at 895. The Department has no authority to expand the definition of developmental disability beyond what the legislature has permitted. *Campbell*, 150 Wn.2d at 895. Under RCW 71A.10.020(3):

> "Developmental disability" means a disability attributable to mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, which disability originates before the individual attains age eighteen, which has continued or can be expected to continue indefinitely, and which constitutes a substantial handicap to the individual.

¶28 The statute also requires the Department to "promulgate rules which define neurological or other conditions in a way that is not limited to intelligence quotient scores as the sole determinant of these conditions." RCW 71A-.10.020(3). Under its statutory authority, the Department

adopted former WAC 388-825-030, which describes the specific eligibility criteria for "developmental disability."[4]

1. Eligibility Criteria

¶29 Pitts argues that a person with developmental disabilities who also suffers from mental illness is a person with a "dual diagnosis," that the legislature did not intend to exclude persons with dual or multiple diagnoses from receiving DDD services, and that the administrative law judge (ALJ) erred in ruling that his handicapping disabilities are the sole result of mental illness and none of his other disabling conditions.

¶30 The Department concedes that many DDD clients have dual diagnoses.[5] But it maintains that Pitts has presented no evidence that his ICAP scores are attributable to anything other than his psychiatric disorders. The Department asserts that it presented substantial evidence that Pitts has functioned well when he was not experiencing acute mental illness and that his currently low adaptive skills are readily attributable to his psychiatric disorders. It argues that the evidence for a psychiatric explanation for Pitts's low ICAP scores is much more persuasive than any other explanation.

A. Former WAC 388-825-030(1)—Developmental Disability

¶31 The regulation defining "developmental disability" appears at former WAC 388-825-030(1)(a)-(d), which states:

(1) A developmental disability is a condition which meets all of the following:

---

[4] The Supreme Court has held that former WAC 388-825-030 "is clearly within the Department's delegated authority." *Campbell*, 150 Wn.2d at 895.

[5] At the first administrative hearing, Mary Tryon, resource manager for the DDD Collaborative Work Program, testified that persons with dual diagnoses of developmental disabilities and mental illness can avail themselves of DDD and mental health services.

(a) A condition defined as mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition as described under WAC 388-825-030;

(b) Originates before the individual reaches eighteen years of age;

(c) Is expected to continue indefinitely; and

(d) Results in a substantial handicap.

### B. Former WAC 388-825-030(4)—Epilepsy

¶32 The regulation describing eligibility for persons with epilepsy appears at former WAC 388-825-030(4). There is no dispute that Pitts has epilepsy with partially controlled seizures that originated before he was 18 and that are expected to continue indefinitely. Thus, the parties stipulate that Pitts meets the requirements of (4)(a), (b), and (d). The remaining issue is whether he has a substantial handicap under (4)(c). Under that provision, a person who is substantially handicapped:

> (i)(A) Requires the presence of another individual to monitor the individual's medication, and is certified by a physician to be at risk of serious brain damage/trauma without direct physical assistance from another individual; or (B) In the case of individuals eighteen years of age or older only, requires the presence of another individual to monitor the individual's medication, and is unable to monitor the individual's own medication resulting in risk of medication toxicity or serious dosage side effects threatening the individual's life; or (ii) Meets the requirements under subsection (6)(b) of this section.

Former WAC 388-825-030(4).

¶33 Under (i)(A), the required assistance must be both direct and physical. As Poltl testified, verbal reminders and cues do not constitute direct physical assistance. Pitts asserts that both Dr. Hageman and Dr. Yao "indicate" that he needs direct physical assistance with his medications. Br. of Appellant at 21. The record, however, shows otherwise.

¶34 Dr. Hageman testified that Pitts can open a bottle, differentiate between different pills, and ingest his medi-

cine independently. He also said that Pitts was able to identify medication, seek assistance in understanding medication issues, identify the possible side effects, and seek assistance with side effects. Further, Pitts was working toward self-medication. Dr. Yao testified that Pitts needed only verbal prompting. The main concern WSH staff have about Pitts is whether he will refuse his medication, not whether he knows how to take it and when. Thus, Pitts has not shown that the assistance he requires is both direct and physical.

¶35 Furthermore, there is no testimony or evidence that Pitts would experience brain damage or trauma if he failed to take his medications due to lack of monitoring or supervision. While doctors commented that he might hurt or seriously injure himself while doing daily activities like eating, walking, or biking, the trauma would be from falling or choking, not from the seizure itself or medication issues. Falling and choking are risks for any epileptic person, even those who need no assistance with medications. Overall, the record contains a sufficient quantity of evidence to persuade a fair-minded person that Pitts is not at risk of serious brain damage or trauma without the direct physical assistance from another individual.

¶36 Under (i)(B), Pitts has to show that he requires another individual to monitor his medication and that he is unable to monitor his own medication, which results in a risk of medication toxicity or serious dosage side effects threatening his life. Again, even if Pitts showed that he is unable to monitor his own medications, there is no evidence that he is at risk for toxicity or serious dosage side effects.

¶37 The WAC does not define these terms. Pitts asks us to hold that the ALJ erred when he limited the meaning of "toxicity" to "an overdose of poison." Br. of Appellant at 24. He posits that if he were to fail to take his medicines, he would be at risk for seizures that could be life threatening, a situation that should be included in the definition of "toxicity." Similarly, he argues that "serious dosage side

effect[s]" should include the side effects of taking no dose. Br. of Appellant at 24.

¶38 We apply our rules of statutory construction to administrative rules and regulations, " 'particularly where . . . they are adopted pursuant to express legislative authority.' " *City of Kent v. Beigh*, 145 Wn.2d 33, 45, 32 P.3d 258 (2001) (quoting *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979)). If a statute's meaning is plain on its face, then we must give effect to that plain meaning as an expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). When we determine the plain meaning, we " 'construe and apply words according to the meaning that they are ordinarily given, taking into account the statutory context, basic rules of grammar, and any special usages stated by the legislature on the face of the statute.' " *Campbell & Gwinn*, 146 Wn.2d at 11 (quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 48A:16, at 809-10 (6th ed. 2000)). "[I]f, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." *Campbell & Gwinn*, 146 Wn.2d at 12.

¶39 The ALJ adopted the plain meaning of these terms. We do the same. The plain meaning of toxicity is: "the quality, state, or relative degree of being toxic or poisonous." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2419 (1969). This definition clearly requires the presence, not the absence, of a poisonous or toxic substance. "Dosage" means "the amount of medicine or other therapeutic agent . . . prescribed or proper for a given patient or illness." WEBSTER'S 676. A side effect of a prescribed amount of medication would logically be an allergy or other adverse reaction to taking that dose, not an effect of failing to take that dose. There is no concern that Pitts may overdose on his medications. And there is no evidence that Pitts has any allergies or adverse reactions to taking his medications.

¶40 The ALJ's interpretation of subparagraph (B) is a plausible construction of the statutory language and is not contrary to the legislative intent. *See Seatoma*, 82 Wn. App. at 518. Further, the record contains a sufficient quantity of evidence to persuade a fair-minded person that Pitts does not exhibit a substantial handicap under that rule.

C. Former WAC 388-825-030(6)—Another Neurological Disorder or Other Condition

¶41 Under former WAC 388-825-030(4)(ii), a person with epilepsy may also demonstrate a substantial handicap if he or she meets the conditions of former WAC 388-825-030(6)(b). That subsection describes eligibility for persons with another condition closely related to mental retardation or requiring treatment similar to that required for individuals with mental retardation. Former WAC 388--825-030(6)(b). It limits eligibility to:

(b) A condition evidenced by:

(i) An intelligence quotient score at least one and one-half standard deviations below the mean, using the Wechsler Intelligence Scale, the Stanford-Binet, or the Leiter International Performance Scale; or

(ii) If the individual's intelligence score is higher than one and one-half standard deviations below the mean, then current or previous eligibility for participation in special education, under WAC 392-172-114 through 392-172-150, shall be demonstrated. Such participation shall not currently or at eighteen years of age be solely due to one or more of the following:

(A) Psychiatric impairment;

(B) Serious emotional/behavioral disturbance; or

(C) Orthopedic impairment; and

(iii) A substantial handicap when a standard score of more than two standard deviations below the mean in each of four domains of the adaptive behavior section of the Inventory for Client and Agency Planning (ICAP) is obtained, the domains identified as:

(A) Motor skills;

(B) Social and communication skills;

(C) Personal living skills;

(D) Community living skills; and

(iv) The ICAP is administered at least every twenty-four months; and

(v) Is not attributable to mental illness, personality and behavioral disorders, or other psychiatric conditions; and

(vi) Meets the requirements under subsection (1)(b) and (c) of this section.

¶42 The parties stipulate that Pitts's intelligence quotient (IQ) and low ICAP scores meet the requirements of subparagraphs (i), (ii), (iii), and (iv) of (6)(b). Thus, the only portion of subsection (6)(b) at issue is subparagraph (v). The ALJ held that the first two subparagraphs under (6)(b) discuss a person's IQ scores, and the following three subparagraphs discuss the requisite ICAP scores. Under this reading, he held that Pitts did not qualify under (6)(b)(v) because he could not successfully show that his ICAP score was not attributable to mental illness.

## 2. Interpretation and Inconsistency

¶43 Pitts argues that the ALJ erred in holding that (6)(b)(v) refers directly to ICAP scores; he reasons that interpreting the provision this way is inconsistent with the Department's charge to serve persons with developmental disabilities. Instead, he advocates a reading in which (6)(b)(v) refers to the condition, not the ICAP score. Accordingly, he asserts that because his epilepsy is not attributable to mental illness and his ICAP scores are sufficiently low, he meets the standard of (6)(b). We disagree.

¶44 Under a plain reading of the statute, the "condition" is one "evidenced" by low IQ and ICAP scores. That condition must not be attributable to mental illness. Pitts maintains that his "condition" is epilepsy, and epilepsy is not attributable to mental illness. But while Pitts has shown that his epilepsy is evidenced by seizures, he has not shown that his epilepsy is evidenced by low scores or that the condition has any affect on his scores whatsoever.

¶45 Pitts also agues that the ALJ's interpretation of the rule conflicts with the stated policy that " '[t]he complexities of developmental disabilities requires the services of many state departments as well as those of the community. Services should be planned and provided as part of a continuum.' " Br. of Appellant at 16 (quoting RCW 71A-.12.010). He reasons that according to this policy, DDD may not exclude persons who have dual diagnoses of mental illness and developmental disabilities. While it may be difficult under the current testing methods to prove that ICAP scores are not attributable to mental illness, Pitts has not shown that it is impossible in all cases. Further, the statute does not explicitly exclude persons with a dual diagnosis. And persons with dual diagnoses who cannot meet paragraph (v)'s condition may be eligible to participate in mental health or other services the Department offered. Pitts is likely one of these persons.

## 3. Substantial Evidence

¶46 Pitts also argues that there is insubstantial evidence that his low ICAP score is attributable to mental illness and not some other condition. The Department argues that it has presented substantial evidence that Pitts functioned well when he was not experiencing acute mental illness and that his currently low adaptive skills are most logically attributable to his psychiatric disorders.

¶47 Indeed, Pitts's mental illness may not be the *sole* cause of his cognitive impairment. He has been diagnosed with other disorders that might contribute to or be the cause of his low scores. For example, there is evidence that Pitts suffers from "cognitive deficits" due to his encephalitis at age 12. AR at 12. He has also been diagnosed with "Borderline to Mild Mental Retardation." AR at 163. Nevertheless, there is no evidence in the record that his ICAP scores evidence these conditions. In contrast, there is a sufficient quantity of evidence to persuade a fair-minded person that his score is attributable to his mental illness. The record is replete with examples where Pitts's caretak-

ers have attributed his difficulties to his psychiatric condition, not his cognitive ability. It is Pitts's burden to demonstrate the invalidity of the Department's action and he has failed to so; thus, the ALJ's findings are not "clearly erroneous."

¶48 Affirmed.

VAN DEREN, A.C.J., and HUNT, J., concur.