[No. 42401-1-II.   Division Two.   September 5, 2012.]

GREGORY LYNN, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

538

*David B. Girard*, for appellant.

*Robert M. McKenna, Attorney General*, and *Jonathon Bashford, Assistant*, for respondent.

¶1 Penoyar, J. — To obtain services from the Department of Social and Health Services (Department) Division of Developmental Disabilities (DDD), an applicant must have a qualifying developmental disability that constitutes a substantial limitation to the individual. Gregory Lynn is diagnosed with autism, a developmental disability, and multiple mental illnesses, including bipolar I. Lynn sought DDD services, but the Department, an administrative law judge (ALJ), and the Board of Appeals concluded that under the law Lynn was not entitled to benefits because he could not prove that his substantial adaptive functioning impairment was attributable to autism, where Lynn's mental illnesses also impaired his adaptive functioning.

¶2 In this administrative appeal, Lynn argues (1) that the Department exceeded its statutory authority in promulgating WAC 388-823-0420, which provides that the Department denies services if it cannot determine whether the applicant's adaptive functioning impairment is caused by the developmental disability or an unrelated mental illness; (2) that the Department's regulations violate the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (ADA) and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796*l*; and (3) that the Department's regulations violate

federal Medicaid laws. We hold that Lynn did not demonstrate that (1) but for his autism he would not have his impairment and (2) a regulatory scheme that limits benefits to those who can demonstrate that their impairment is caused by specified disabilities exceeds its statutory authority or violates the ADA, the Rehabilitation Act, or federal Medicaid laws. We affirm.

## FACTS

¶3 Lynn is 28 years old. He is diagnosed with autism.[1] When he was first diagnosed with autism, the doctor explained that Lynn's autistic qualities are "mild" in that he "possesses adequate verbal skills for answering concrete questions and for expressing his basic needs" but "lacks subtle [communication] skills that are required to effectively interact with an adult community." Administrative Record (AR) at 229-30. Lynn is also diagnosed with bipolar I, with his most recent episode being manic with psychotic features.[2]

¶4 With a few brief exceptions, Lynn was institutionalized at Western State Hospital from 2006 until 2009, when he moved into a group home in Burien.[3] During periods when he stopped taking his medication, Lynn acted dangerously: assaulting his parents, self-cutting, drinking antifreeze, attempting to put metal objects into electrical outlets, and removing and attempting to set fire to his clothing in a hotel elevator.

---

[1] Lynn was first diagnosed with Asperger's syndrome, which is a milder form of autism on the continuum of conditions collectively called the Autism Spectrum Disorder. *See Autism Fact Sheet*, NAT'L INST. NEUROLOGICAL DISORDERS & STROKE, http://www.ninds.nih.gov/disorders/autism/detail_autism.htm (last updated July 24, 2012). He was later diagnosed with autism.

[2] Lynn has previously been diagnosed with attention deficit hyperactivity disorder, Tourette's syndrome, pervasive developmental disorder, obsessive compulsive disorder, oppositional defiant disorder, major depression, and an anorexic episode.

[3] Lynn states that he currently lives at Western State Hospital, but at the time of the hearing, he lived in a group home.

¶5 In 2001, Lynn first applied for DDD enrollment. He was found ineligible because at the time, he was diagnosed with Asperger's syndrome, which is not a qualifying developmental disability. *See* WAC 388-823-0040. Shortly thereafter, Lynn's psychologist diagnosed him with autism, and Lynn was found DDD eligible. At the time, DDD eligibility rules did not require evidence of adaptive functioning deficits to qualify for benefits under the autism category. Former WAC 388-825-030(5)(b)(ii), (6)(b)(ii) (1999).

¶6 In 2005, the Department revised its DDD eligibility rules to require individuals with autism to provide specific evidence of adaptive functioning deficits. Wash. St. Reg. 05-12-130 (July 2, 2005). In August 2006, Lynn requested new DDD services from the Department, triggering an automatic eligibility review under the new rules. WAC 388-823-1010(3). The Department denied benefits after it concluded that Lynn did not have a valid autism diagnosis because he lacked early language delays. The Pierce County Superior Court ultimately concluded that the Department had applied the incorrect evidentiary standard and that Lynn had a valid autism diagnosis, remanding back to the Department to determine whether Lynn had adaptive functioning limitations due to autism.

¶7 In January 2009, the Department sent Lynn a new DDD termination notice after a DDD eligibility specialist determined that his mental illness was too severe to determine what portion, if any, of his functional deficits were due to autism. The notice explained that "the Department is unable to determine that Mr. Lynn's current adaptive functioning is the result of the Autistic Disorder diagnosis because of the extensive and ongoing history of serious mental health problems." AR at 217.

¶8 Lynn requested an administrative hearing, where the parties agreed that Lynn could be DDD eligible only because of his autism diagnosis. The hearing focused on whether Lynn was eligible under the rules for autism, namely, WAC 388-823-0420's adaptive function requirements.

¶9 Linda Lundsford, a DDD intake and eligibility program manager, testified that regulations allow the Department to deny benefits if it determines that a person's current adaptive functioning impairment results from a developmental disability because of an unrelated injury or illness. When a person is both mentally and developmentally disabled, it is "very difficult" to establish eligibility, but the Department would consider evidence of qualifying impairments before the outset of the mental illness to determine eligibility. Report of Proceedings (RP) at 158-59. She added that it is generally impossible to distinguish between the limitations attributable to autism versus a coexisting mental illness. She stated that if a person is dually diagnosed with a developmental disability and a mental illness, the Department would accept a qualifying Vineland Behavior Scales adaptive functioning test score if the person was "considered cured" or "no longer experiencing any effects of that mental illness." RP at 162.

¶10 Dr. Gene McConnachie, DDD's psychologist, opined that "probably primarily I think the major mental illness in my professional opinion is the cause of [Lynn's] substantial functional deficits. And that's from reading his record, not the autistic disorder." RP at 100. Dr. McConnachie then testified that "we'll never know what was due to autism, what's due to the mental illness, bipolar disorder or other illnesses, and there's no way to separate out the impact of which is causing how much of what." RP at 138.

¶11 Dr. Wendy Marlowe conducted a Vineland-II Behavioral Scales adaptive functioning test for Lynn in July 2008. Her test relied on interviewing Lynn's parents, since he had lived with them until 2005, and interviewing Lynn's care provider. Dr. Marlowe did not review any of Lynn's mental health records from Western State Hospital. The test concluded that Lynn had substantial limitations in adaptive function. Dr. Marlowe opined that the autism was the primary cause of his functioning limitations.

¶12 The ALJ concluded that Lynn was not eligible for DDD services. The ALJ concluded that it could not consider

Dr. Marlowe's test results because of Lynn's mental illness and, thus, he failed to meet his burden:

> [I]t is the ultimate conclusion of the Tribunal that the January 6, 2009 termination of DDD benefits to [Lynn] was the result required by application of the Department's regulations, which the undersigned Administrative Law Judge must apply as the first source of law. WAC 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. DDD has, and in the view of the Tribunal, correctly so, determined that [Lynn] has an unrelated illness which impairs both his current adaptive functioning and his adaptive functioning as it existed in 2005 and early 2006. Accordingly, Dr. Marlowe's Vineland results cannot be considered, much less accepted, by DDD. WAC 388-823-0420(2)(a).

AR at 80.

¶13 The Board of Appeals (Board) affirmed. The Board found that Lynn had a "valid diagnosis of autism" and that the "Autistic Disorder alone must be the cause of deficits in adaptive functioning sufficient to qualify under the rules." AR at 25. The Board found that Lynn had a history of mental health problems and that at the time of the hearing, Lynn still carried a diagnosis of bipolar I, with his most recent episode being manic with psychotic features. The Board concluded that to be diagnosed with bipolar I, Lynn had to have significant adaptive functioning problems. Based on "the testimony of Dr. McConnachie," the Board found that Lynn's "mental illness is the primary cause of his substantial functional deficits." AR at 31. It also deemed Dr. Marlowe's conclusions not credible. The Board ruled that it is impossible to determine whether Lynn's autism or mental illnesses cause his adaptive functioning deficits:

> In sum, [Lynn] has Bipolar I disorder and Attention Deficit Hyperactivity disorder, and did at the time of the adaptive functioning testing that [Lynn] has offered. Those mental illnesses do (by definition and in fact) cause adaptive functioning deficits unrelated to [Lynn's] autism. [Lynn] has the burden of proving that he is eligible for DDD services under the "autism" category and he has failed to provide the requisite

evidence of adaptive functioning limitations necessary to meet that burden. Nobody can determine what, if any, functional impairments [Lynn] has as a result of his autism alone; under WAC 388-823-0420(2), the DDD is barred from attempting that impossible task. The Department correctly denied [Lynn's] request for DDD services.

AR at 37.

¶14 Lynn petitioned for judicial review in Thurston County Superior Court, arguing that the Department exceeded its statutory authority when it promulgated the regulations defining "developmental disability," that the regulations are inconsistent with federal Medicaid laws, and that the regulations violate the federal ADA. The superior court ruled that the Department's eligibility rules were consistent with the statutory definition of a "developmental disability" set forth in former RCW 71A.10.020(3) (1998), were not arbitrary and capricious, and were a valid exercise of the Department's rule-making authority.[4] The superior court also ruled that the regulations did not conflict with the Medicaid requirements or the ADA. The superior court affirmed the Board's decision and dismissed the matter. Lynn appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

¶15 The Administrative Procedure Act (APA), chapter 34.05 RCW, governs our review of the Board's denial of

---

[4] At the time of the administrative hearing, the statute required the applicant's disability to constitute a "substantial handicap." Former RCW 71A.10.020(3) (1998). In 2010, the legislature amended the statute to require the disability to constitute a "substantial limitation" and to replace the phrase "mental retardation" with "intellectual disability." LAWS OF 2010, ch. 94, § 21. The legislature intended that the changes "remove demeaning language" from the statute, but it did not intend to expand, contract, or otherwise change the statute's application. LAWS OF 2010, ch. 94, § 21. We use the more respectful language when possible. Also, the legislature amended former RCW 71A.10.020 to add an additional subsection, moving the developmental disability definition to subsection (4), but this amendment did not otherwise change the definition. LAWS OF 2011, 1st Spec. Sess., ch. 30, § 3.

developmental disability services. *Nix v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 902, 912, 256 P.3d 1259 (2011), *review denied*, 173 Wn.2d 1008 (2012). " 'We apply the [APA] standards . . . directly to the [agency] record . . . , sitting in the same position as the superior court.' " *Nix*, 162 Wn. App. at 912 (alterations in original) (internal quotation marks omitted) (quoting *Utter v. Dep't of Soc. & Health Servs.*, 140 Wn. App. 293, 299, 165 P.3d 399 (2007)).

¶16 We give substantial weight to an agency's interpretation of its own eligibility criteria for developmental disability services, as well as considerable deference to the agency's expertise and interpretation of its own rules. *Nix*, 162 Wn. App. at 912; *D.W. Close Co. v. Dep't of Labor & Indus.*, 143 Wn. App. 118, 128-29, 177 P.3d 143 (2008); *see Ballinger v. Dep't of Soc. & Health Servs.*, 104 Wn.2d 323, 336, 705 P.2d 249 (1985). Under the APA, Lynn, as the challenging party, bears the burden of demonstrating the invalidity of the agency decision. *See* RCW 34.05.570(1)(a); *Nix*, 162 Wn. App. at 912.[5]

---

[5] RCW 34.05.570(3) explains when a court can grant relief when reviewing an agency order in adjudicative proceeding:

Review of agency orders in adjudicative proceedings. The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:

(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

(c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

(f) The agency has not decided all issues requiring resolution by the agency;

(g) A motion for disqualification under RCW 34.05.425 or 34.12.050 was made and was improperly denied or, if no motion was made, facts are shown to support the grant of such a motion that were not known and were not reasonably discoverable by the challenging party at the appropriate time for making such a motion;

II. BACKGROUND AND APPLICABLE LAW

██ ██ ¶17 Included within the services Washington offers to individuals with disabilities are services to individuals with developmental disabilities. Title 71A RCW. To qualify for the services, a person must have a developmental disability, as defined by statute. RCW 71A.16.020; WAC 388-823-0020. RCW 71A.10.020(4) provides a definition of "developmental disability":

> "Developmental disability" means a disability attributable to intellectual disability, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to an intellectual disability or to require treatment similar to that required for individuals with intellectual disabilities, which disability originates before the individual attains age eighteen, which has continued or can be expected to continue indefinitely, and which constitutes a substantial limitation to the individual.

Thus the statute placed a burden on Lynn to prove that his impairments were attributable to his autism. RCW 34.05.570(1)(a).

¶18 The Department has authority to "adopt rules further defining and implementing the criteria" for eligibility. RCW 71A.16.020(2). Under those regulations, an applicant must show that he has a qualifying lifelong condition that results "in substantial limitations to an individual's adaptive functioning." WAC 388-823-0040. An individual with autism must show that he has a diagnosis of autism as defined in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th rev. ed. 2000), with developmental delays beginning before age three. WAC 388-823-0510, -0515(1). The applicant must show that the autism constitutes a substantial

---

(h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

(i) The order is arbitrary or capricious.

limitation on his current adaptive functioning. WAC 388--823-0510, -0515(2).

¶19 A "substantial limitation" is shown by a qualifying score on the Vineland or Scales of Independent Behavior, Revised (SIB-R) tests within the previous 36 months. WAC 388-823-0420(1). A qualifying score is two standard deviations below the mean. WAC 388-823-0420. If the applicant does not submit a valid test, the Department will administer its own adaptive function test called the Inventory for Client and Agency Planning (ICAP). WAC 388-823-0420(1)(c).

¶20 The adaptive functioning tests measure only how well the individual performs; they do not identify the cause of an individual's impairments. The Department will not accept the results of a Vineland test and will deny eligibility if it cannot rule out that the adaptive functioning impairment results from an unrelated injury or illness:

> If DDD is unable to determine that your current adaptive functioning impairment is the result of your developmental disability because you have an unrelated injury or illness that is impairing your current adaptive functioning:
>
> (a) DDD will not accept the results of a [Vineland] or SIB-R administered after that event and will not administer the ICAP; and
>
> (b) Your eligibility will have to be determined under a different condition that does not require evidence of adaptive functioning per a [Vineland], SIB-R or ICAP.

WAC 388-823-0420(2).

III.   WAC 388-823-0420 Is Consistent with the Statutory Definition of "Developmental Disability"

¶21 Lynn argues that WAC 388-823-0420(2) exceeds the statutory authority granted to the Department by the statute defining "developmental disability," RCW 71A.10-.020(4), and by the statute giving the Department authority to promulgate rules to establish criteria, RCW 71A.16-.020(2). He argues that the regulation is inconsistent with

the statutory authority because "the regulation denies eligibility to entire classes of persons that the Legislature intended to be eligible for DDD services and benefits if they could show that their condition or disorder resulted in a substantial handicap to them." Appellant's Br. at 20. The implication of Lynn's argument is that the statute requires only that there be some causal connection between the qualifying condition and the substantial limitation. The problem with this argument is that more than general causation is required; Lynn must demonstrate that his condition is "attributable" to his statutorily defined disability.

¶22 As relevant here, RCW 71A.10.020(4) defines a "developmental disability" as "a disability *attributable* to ... autism ... which constitutes a substantial limitation to the individual." (Emphasis added.) The dictionary definition of "attributable" is "capable of being attributed." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 141 (2002). As pertinent here, "attribute" means "to explain as caused or brought about by : regard as occurring in consequence of or on account of." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 142. In the context of RCW 71A.10.020(4), Lynn's impairment must be brought about by or a consequence of his autism. Put differently, the plain meaning of RCW 71A.10-.020(4) requires that to qualify for benefits, Lynn's autism must be a cause in fact of his impairment. And the Department may "adopt rules further defining and implementing the criteria in the definition of 'developmental disability' under RCW 71A.10.020[(4)]." RCW 71A.16.020(2); *see In re Estate of Blessing*, 174 Wn.2d 228, 231, 273 P.3d 975 (2012) (court may look to a dictionary for ordinary meaning when a statutory term is undefined).

¶23 As the State points out, WAC 388-823-0420 does not exclude dually diagnosed individuals by reason of dual diagnosis itself. The regulations set guidelines for determining when an applicant's impairment is "attributable" to

his developmental disability. It does so by evaluating an applicant's impairment and its cause. By requiring a qualifying score on the Vineland, SIB-R, or ICAP tests, the Department set forth objective criteria to determine whether an applicant has a substantial limitation of adaptive functioning, as RCW 71A.10.020(4) requires, to be DDD eligible. And by providing that the Department will not accept the results of the tests if DDD cannot determine whether the functional impairment is the result of an unrelated injury or illness, the regulation complies with RCW 71A.10-.020(4)'s requirement that the applicant's substantial impairment be attributable to the developmental disability, in this case, autism.[6]

¶24 Thus, the dispositive flaw in Lynn's argument is that following the ALJ's and the Board's unchallenged factual findings, there is no credible evidence that Lynn's autism was a cause in fact of his substantial adaptive functioning impairment. While Dr. Marlowe's report opined that Lynn's autism was the primary cause of his functioning limitations, the ALJ and the Board both concluded that her conclusions were not credible. Meanwhile, Dr. McConnachie testified that while it is impossible to determine the extent to which his autism and mental illness each affected Lynn's functioning impairment, the mental illness caused Lynn's substantial functional deficits. On these facts and with these credibility findings, Lynn failed to meet his burden of proving that autism was a cause in fact of his adaptive functioning impairment.[7]

---

[6] *See also Pitts v. Dep't of Soc. & Health Servs.*, 129 Wn. App. 513, 119 P.3d 896 (2005).

[7] In its brief and at oral argument, the Department argued that Lynn needed to prove that his autism alone caused his substantial impairment. This would read the word "attributable" to mean "solely caused by." But if the legislature had meant that, it would have said something more like "entirely attributable to" instead of simply "attributable to." We find that "cause in fact" is far closer to the mark. While we currently find this to be an accurate standard under the statute, in the future the Department is free to "adopt rules further defining and implementing the criteria in the definition of 'developmental disability' under RCW 71A.10.020[(4)]." RCW 71A.16.020(2).

IV. WAC 388-823-0420 Is Consistent with the ADA and Rehabilitation Act

¶25 Lynn argues that the DDD eligibility scheme discriminates against persons with developmental disabilities and either a sensory, mental, or physical disability, in violation of the Rehabilitation Act and the ADA. He argues that the scheme discriminates (1) by direct discrimination based on the disability type; (2) by requiring persons with dual diagnoses to be cured of their mental or psychological illnesses before DDD will consider them for eligibility for services for their developmental disability; and (3) by forcing persons with dual diagnoses to be placed in more restrictive or segregated environments, such as Western State Hospital, in order to receive adequate treatment. The Department responds that its regulations do not discriminate and that Lynn is not unnecessarily institutionalized. Because the regulation does not discriminate on the basis of disability and because Lynn failed to provide any evidence that he was unnecessarily institutionalized or that he requested an accommodation, we reject his argument.

¶26 To prevail on a claim that a public program or service violates Title II of the ADA, a plaintiff must show:

(1) he is a "qualified individual with a disability"; (2) he was either excluded from participation or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) *such exclusion, denial of benefits, or discrimination was by reason of his disability.*

*Weinreich v. L.A. County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997); *see* 42 U.S.C. § 12132. Similarly, under section 504 of the Rehabilitation Act, a plaintiff must prove that he was denied the benefits of the program "*solely by reason of his disability.*" *Weinreich*, 114 F.3d at 978; *see* 29 U.S.C. § 794. In *Weinreich*, the plaintiff challenged a transit agency's requirement that persons seeking a reduced fare must provide periodic medical reports to sub-

stantiate a disability, arguing that the rules violated the ADA and the Rehabilitation Act. *Weinreich*, 114 F.3d at 978. The Ninth Circuit rejected the argument:

> Weinreich's exclusion from the Reduced Fare Program was not based on the fact or perception that he has a disability. To the contrary, his exclusion was based on the possibility that he does *not* have a qualifying disability. Specifically, his exclusion was based on his failure to provide updated certification that he has a qualifying disability.

*Weinreich*, 114 F.3d at 979.

■ ¶27 We agree with *Weinreich*'s reasoning. WAC 388--823-0420 does not discriminate or exclude applicants simply because they have a mental illness. Rather the regulation ensures that applicants' developmental disability causes the substantial functioning impairment that the DDD services aim to remediate. The regulation thus does not discriminate on the basis of mental illness, where separate statutes and services govern those situations. *See* Title 71 RCW. We reject Lynn's argument that the Department's regulations improperly discriminated against him based on his disability, in violation of the ADA and Rehabilitation Act.

¶28 We also reject Lynn's argument that he has been unnecessarily institutionalized at Western State Hospital because of discrimination based on his disabilities. Eligibility for DDD benefits that might have enabled Lynn to be placed in another setting was denied because Lynn could not prove that his autism caused his impairments, not because of his other disabilities. If Lynn could have proved his case, he would have been eligible for DDD benefits regardless of his other issues. Further, Lynn fails to meet his burden to produce evidence that a reasonable accommodation exists and that this accommodation would help him meet the program's requirements. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816-17 (9th Cir. 1999). Lynn's argument fails.

V. WAC 388-823-0420 Is Consistent with Federal Medicaid Laws

¶29 Lynn argues that DDD eligibility rules violate federal Medicaid laws and regulations on comparability and on proscribing diagnosis discrimination. He adds that WAC 388-823-0420 is unreasonable and arbitrary because it is not based on medical necessity or health-related standards. The Department responds that WAC 388-823-0420 is reasonable, that the Department did not deny any required Medicaid service, and that the federal government waived the comparability requirement to allow Washington to offer specialized programs. Because the Department did not deny any required Medicaid service, we reject Lynn's argument.

¶30 We already have held that DDD services are not subject to diagnosis discrimination claims. *Nix*, 162 Wn. App. at 915-17. In *Nix*, Nix appealed the denial of his DDD benefits after the Department determined that his mild mental retardation did not qualify him for services, arguing that the decision violated the federal Medicaid diagnosis discrimination prohibition, 42 C.F.R. § 440.230(c). 162 Wn. App. at 911-12, 915. Like Lynn, Nix relied on *White v. Beal*, 555 F.2d 1146 (3d Cir. 1977). We held that the issue turned on whether the services were required under 42 C.F.R. §§ 440.210 and 440.220, and because none of the requested services were required, Nix's argument failed. *Nix*, 162 Wn. App. at 916-17; *see Rodriguez v. City of New York*, 197 F.3d 611, 617 (2d Cir. 1999) (lack of a required service is fatal to a diagnosis discrimination claim).

¶31 Here, Lynn argues that WAC 388-823-0420 violates federal Medicaid laws because it discriminates against persons with a developmental disability and a mental illness. Like the applicant in *Nix*, Lynn did not request services that DDD is required to provide under federal law; in fact, he does not even discuss what services are implicated. Because Lynn failed to show that DDD services were

required, like in *Nix*, the lack of a stated required service is fatal to his discrimination claim. *Nix*, 162 Wn. App. at 916-17; *Rodriguez*, 197 F.3d at 617.

¶32 For the reasons explained above, Lynn's argument that WAC 388-823-0420 is unreasonable fails. Federal Medicaid laws require states to develop reasonable standards for determining the extent of assistance available under their state plan. 42 U.S.C. § 1396a(a)(17). As alluded to above, WAC 388-823-0420 is consistent with that requirement in that it creates objective criteria to determine whether an applicant has a substantial functioning impairment attributable to the developmental disability. These criteria are consistent with RCW 71A.10.020(4) and the Medicaid requirements.

¶33 We affirm.

ARMSTRONG and HUNT, JJ., concur.